No. 123,322

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.W.,
A Minor Child.


SYLLABUS BY THE COURT


1.

A party cannot waive an objection to subject matter jurisdiction and can raise it at any time, even for the first time on appeal.


2.

Kansas district courts have general jurisdiction of all civil and criminal matters, unless otherwise provided by law. As a general matter, district courts have the subject-matter jurisdiction to consider disputes that a court might address unless some other statute limits that authority.


3.

The Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA), K.S.A. 2020 Supp. 23-37,101 et seq., limits a Kansas court's subject matter jurisdiction. The UCCJEA's purpose is to avoid jurisdictional disputes between courts of different states over child custody issues. It does so with rules that generally limit jurisdiction over child custody matters in any particular family to one state at a time.


4.

Vital to the UCCJEA's method of keeping order between the states are two provisions. First, an initial custody decision must be made by the child's home state. Second, once that initial custody determination has been made, the state making it

1

generally retains exclusive jurisdiction over later custody issues until an event listed in the UCCJEA occurs.

5.

It is erroneous for a district court to assume subject matter jurisdiction over a child in need of care case with interstate connections without ensuring the UCCJEA's provisions are satisfied.

6.

Unless otherwise provided by the UCCJEA, a court has the jurisdiction to make an initial child custody determination only if the state is the home state of the child on the date of the proceeding's commencement. "Home state" means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding. A period of temporary absence of any of the mentioned persons is part of the period.

7.

The determination of a child's home state is an objective question. The UCCJEA's language "state in which a child lived" does not suggest any concepts of legal residence, which is governed by an intention to stay or to return to a location and incorporates physical presence, not legal residence.

8.

For a home state to decline jurisdiction under the UCCJEA, the plain language of the statute requires a court, not a state agency, of the home state to decline jurisdiction.

9.

K.S.A. 2020 Supp. 23-37,208(a) directs a district court to decline jurisdiction when "a person seeking to invoke jurisdiction engaged in unjustifiable conduct." By its

plain language, only the person seeking to invoke the jurisdiction of the court may engage in unjustifiable conduct so as to prohibit the court's assumption of jurisdiction under the UCCJEA.

10.

Emergency jurisdiction under the UCCJEA allows a court to enter temporary orders to protect a child—but absent child abandonment, the situation must be an emergency. An emergency is a serious situation or occurrence that happens unexpectedly and demands immediate action. The fact that a child may be a child in need of care is an insufficient basis for emergency jurisdiction.

11.

A court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse.

12.

If a previous child custody determination or proceeding exists, any emergency order must specify the period the court considers adequate to allow the person seeking an order to obtain such order from a court of a state having jurisdiction. If no child custody proceeding has been commenced in a court of a state having jurisdiction, an emergency child custody order remains in effect until an order is obtained from a court of a state having jurisdiction. If a proceeding is not commenced, then any emergency order entered becomes final.

13.

If an emergency as defined by the UCCJEA exists, a district court is limited by the UCCJEA to only exercising temporary emergency jurisdiction. Such emergency

jurisdiction limits the district court to issuing temporary orders to protect the child until the state with home state jurisdiction can act. Such authority does not extend to issuing more permanent orders such as a child in need of care adjudication.

14.

Emergency jurisdiction under the UCCJEA indicates that any temporary emergency orders issued become final in the absence of any orders from a home state court. This suggests that temporary emergency jurisdiction can ripen into home state jurisdiction once the home state declines jurisdiction.

Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Opinion filed June 18, 2021. Vacated and remanded with directions.

*Richard P. Klein*, of Olathe, for appellant natural mother.

*Jacob M. Gontesky*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

Before POWELL, P.J., MALONE and GARDNER, JJ.

POWELL, J.:  A.W., a minor, and his mother are residents of Missouri. In November 2019, Mother took A.W., then 14 years old, to a hospital in Independence, Missouri, because he was suffering from diabetic ketoacidosis. She subsequently requested that he be transferred to Overland Park Regional Medical Center (OPMC) in Overland Park, Kansas. In March 2020, A.W. was readmitted to OPMC due to a reoccurrence of his condition. Because of these events and events occurring between these two hospital admissions, an investigation of A.W.'s welfare was initiated by authorities in Kansas, with the assistance of Missouri authorities, and culminated in a child in need of care (CINC) action being filed by the State in the Johnson County District Court. The district court assumed jurisdiction and subsequently adjudicated A.W.

4

to be a CINC. Mother appeals, alleging for the first time the district court did not have jurisdiction under the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA) and that clear and convincing evidence did not support the district court's CINC adjudication.

Following a review of the record, we conclude that at the time of the filing of the CINC petition, the district court—at best—could only assume emergency jurisdiction over A.W. because Kansas was not A.W.'s home state; Missouri was. Thus, at the time the district court adjudicated A.W. a CINC, it lacked the jurisdiction to issue such an order as emergency jurisdiction only conferred upon the district court the authority to issue temporary orders protecting the safety of the child. We therefore vacate the district court's CINC order and remand with instructions for the district court to contact the appropriate Missouri court to see if it will waive or accept jurisdiction over A.W.

FACTUAL AND PROCEDURAL BACKGROUND

As the issue before us principally concerns subject matter jurisdiction, we recite the relevant facts impacting that question.

A.W. was born in 2005 and was 15 years old at the time of the CINC trial. Mother is a single parent of seven children. A.W.'s father is deceased. Mother's employment is akin to a bounty hunter, requiring frequent out-of-state trips to complete tasks assigned to her by the United States Drug Enforcement Agency.

According to Mother, the Missouri Department of Family Services (DFS) took custody of her children in 2011, but the children were returned to her care within a few months. After that case was closed, Mother moved her family to Texas. During a visit to Mother's grandfather in Missouri in November 2017, A.W.—then age 12—was first hospitalized with diabetic ketoacidosis and diagnosed with type 1 diabetes. Although the

5

record is not clear, Mother and her family frequently stayed at her grandfather's house beginning at this point in time.

The next year involved few health complications—a time Mother described as a honeymoon period. Then, A.W. was hospitalized again in October 2018 at Children's Mercy Hospital in Missouri. A.W. was prescribed insulin during this hospital stay. Concern arose among the hospital staff after A.W. had missed appointments in February and April following his first hospitalization and twice in November 2018 after his second stay. Regular visits are important for a child suffering multiple occurrences of diabetic ketoacidosis.

In early 2019, Mother was attempting to renovate a house in Plattsburg, Missouri, with the intention of moving the house and her family to Texas once she finished. While Mother was renovating the house, A.W. stayed with a family friend, Mark Strobel, at a Kansas City, Missouri, apartment. Strobel took A.W. to Children's Mercy in June 2019 when A.W. started "acting funny." A.W. was again admitted for diabetic ketoacidosis. A.W. had high blood sugar, vomiting, and poor breathing. Hospital staff expressed concern over A.W.'s eating habits, noting he looked thin and had only been eating hard-boiled eggs and pickles.

Hospital staff struggled to reach Mother during A.W.'s hospital stay. Mother told staff she was temporarily staying with Strobel and was not sure where A.W. would stay when he was discharged. After his discharge, the medical team scheduled follow-up appointments every three months. A.W. came to his appointment in July but did not come to two later appointments and canceled two others.

Mother brought A.W. to Centerpoint Medical Center in Independence, Missouri, in November 2019 for diabetic ketoacidosis, where A.W. was observed to have dehydration, high blood sugar, and Kussmaul respirations (heavy breathing while

6

remaining awake and alert). Mother requested Centerpoint transfer A.W. to OPMC. Mother did not want to return to Children's Mercy because hospital staff contacted Missouri DFS when A.W. was there in June 2019. A.W. was admitted to the intensive care unit at OPMC, where he remained for three days. A.W. was released and ultimately began receiving multiple insulin injections each day.

In March 2020, because of high blood sugar levels, A.W. was outfitted with an insulin pump. At around the same time, Mother had given up on renovating the house in Plattsburg and was staying with an 87-year-old retired Army Colonel in his two-bedroom house in Independence, Missouri. However, Mother continued to use Strobel's mailing address and his vehicle.

A.W. was again admitted to OPMC with diabetic ketoacidosis in April 2020. A.W. remained in the intensive care unit for eight days—first to treat his condition and, later, because the State was seeking court intervention to protect A.W.'s welfare. In the two years before the State filed its CINC petition, A.W. had been hospitalized with diabetic ketoacidosis five times: twice in 2018, twice in 2019, and once in 2020.

Christine McAtee, the OPMC social worker, had visited with A.W. in November 2019 and did so again in April 2020. McAtee had concerns about Mother managing A.W.'s condition, his access to insulin, and the family's lack of stable housing. McAtee called Missouri DFS because Mother had a Kansas City, Missouri, address.

A Missouri DFS child protection services worker, Ashely McCoy, contacted Mother at an apartment in Kansas City, Missouri. Mother appeared surprised McCoy had found her. McCoy informed Mother she needed to see Mother's other children and the apartment to ensure A.W. would be safe if discharged into Mother's care. Mother refused to cooperate absent a court order.

Paula McRoy, a child protective specialist with the Kansas Department for Children and Families, investigated the allegations involving Mother and A.W. McRoy was concerned that A.W. could not explain what his mother did for a living or how he obtained or stored insulin, and that A.W.'s pump was shut off when A.W.'s blood sugar levels were high. Mother refused to work with McRoy without a court order.

A meeting was held on April 16, 2020, between hospital social workers, Kansas and Missouri social workers, and Mother. Mother believed A.W.'s pump had calibration issues, and she had concerns about obtaining a sufficient insulin supply. Mother again stated she would only cooperate with a court order. Mother said she was not homeless but was establishing a home in El Paso, Texas.

McRoy indicated Missouri would not file a court case because A.W. was in Kansas and provided a letter to Mother indicating the same. Kansas filed a CINC petition on April 17, 2020, and A.W. was placed in foster care. Mother did not visit A.W. once he was in the State's care because she would not sign the necessary visitation paperwork.

On August 17, 2020, the district court adjudicated A.W. as a CINC under K.S.A. 2020 Supp. 38-2202(d)(1)-(3) because of his inadequate medical care, his lack of education, and his lack of stable housing.

Mother timely appeals.

## DID THE DISTRICT COURT HAVE SUBJECT MATTER JURISDICTION UNDER THE UCCJEA?

For the first time, Mother argues on appeal the district court lacked subject matter jurisdiction over A.W. because Missouri was A.W.'s home state. Mother also argues no

8

exception to home state jurisdiction in the UCCJEA applies here to give a Kansas court jurisdiction.

The State submits three avenues for us to find the district court had subject matter jurisdiction. First, the State argues Mother did not establish Missouri was A.W.'s home state, and, even if it was, it is no longer. Second, even if Missouri was A.W.'s home state, the State argues Kansas has jurisdiction because Mother engaged in unjustifiable conduct by bringing A.W. to a Kansas hospital for treatment to avoid Missouri child protective services. And third, the State asserts Kansas had emergency jurisdiction because Mother abandoned A.W. and because of the emergency presented by A.W.'s hospitalization for diabetic ketoacidosis.

*Standard of Review*

The existence of subject matter jurisdiction is a legal question reviewed de novo. *In re K.L.B.*, 56 Kan. App. 2d 429, 436, 431 P.3d 883 (2018).

*Analysis*

Kansas district courts have general jurisdiction of all civil and criminal matters, unless otherwise provided by law. "As a general matter, then, our district courts have the subject-matter jurisdiction to consider disputes that a court might address unless some other statute limits that authority." *In re A.A.*, 51 Kan. App. 2d 794, 803, 354 P.3d 1205 (2015). A party cannot waive an objection to subject matter jurisdiction and can raise it at any time, even for the first time on appeal. *In re K.L.B.*, 56 Kan. App. 2d at 437; *In re A.A.*, 51 Kan. App. 2d at 805.

The UCCJEA is one such limitation on subject matter jurisdiction as both Kansas and Missouri have adopted it. See K.S.A. 2020 Supp. 23-37,101 et seq.; *In re A.A.*, 51

Kan. App. 2d at 804; Mo. Rev. Stat. § 452.700. The UCCJEA's purpose is to avoid jurisdictional disputes between courts of different states over child custody issues. It does so with rules that generally limit jurisdiction over child custody matters in any particular family to one state at a time. *In re A.A.*, 51 Kan. App. 2d at 804. The UCCJEA applies to CINC proceedings. 51 Kan. App. 2d at 806.

Vital to the UCCJEA's method of keeping order between the states are two provisions. First, an initial custody decision must be made by the child's home state. See K.S.A. 2020 Supp. 23-37,201(a). Second, once that initial custody determination has been made, the state making it "generally retains exclusive jurisdiction over later custody issues until an event listed in the UCCJEA . . . occurs." 51 Kan. App. 2d at 804; see K.S.A. 2020 Supp. 23-37,202(a).

Here, Mother did not challenge subject matter jurisdiction before the district court and the district court found it had subject matter jurisdiction without addressing the UCCJEA. It is erroneous for a district court to assume subject matter jurisdiction over a CINC case with interstate connections without ensuring the UCCJEA's provisions are satisfied. *In re K.L.B.*, 56 Kan. App. at 439 (quoting *In re A.A.*, 51 Kan App. 2d at 806). Although the district court erred by not addressing the UCCJEA in finding it had subject matter jurisdiction, because subject matter jurisdiction is reviewed de novo, we can still determine if subject matter jurisdiction exists.

A.      *Home state jurisdiction*

Unless otherwise provided, a court has the jurisdiction to make an initial child custody determination only if the state is the home state of the child on the date of the proceeding's commencement. K.S.A. 2020 Supp. 23-37,201(a)(1).

"'Home state' means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding. . . . A period of temporary absence of any of the mentioned persons is part of the period." K.S.A. 2020 Supp. 23-37,102(8).

Mother and A.W. were living in Missouri in 2011 when Missouri took custody of Mother's children. Once the case was closed, Mother moved with her children to Texas. Mother and her children continued to visit her grandfather in Missouri a few times a month, and in June 2019, Mother decided it was easier to stay in Missouri with her children rather than continuing to drive back and forth. Mother was working on fixing up a house she eventually wanted to move back to Texas. In July 2019, after her grandfather died, Mother decided to move back to Texas but was trying to save money before doing so.

In April 2020, A.W. was admitted to OPMC with diabetic ketoacidosis. Mother and A.W. were still living in Missouri at this point. The State filed its CINC petition on April 17, 2020.

Despite the State's contention, the record demonstrates A.W. and Mother lived in Missouri for over six months before the State filed its petition. That makes Missouri the home state under the UCCJEA. The State tries to overcome this by raising a residency argument and claiming that about six months before the petition Mother was planning on moving the family to Texas. The State also points out that Mother testified she intended to move the family to Texas when the winter was over.

Essentially, the State is arguing Missouri is not A.W.'s home state because Mother lacked an intent to remain. The determination of a child's home state is an objective question. *In re E.T.*, No. 111,971, 2015 WL 1125364, at *5 (Kan. App. 2015) (unpublished opinion). The UCCJEA's language "state in which a child lived" does not

11

"'suggest any concepts of legal residence, which is governed by an intention to stay or to return to a location' [and] incorporates 'physical presence, not legal residence.'" 2015 WL 1125364, at *5. Using a parent's subjective intent to remain in a particular state is inconsistent with the UCCJEA's requirements and is not a factor in determining the home state of the child. 2015 WL 1125364, at *5.

A.W. lived in Missouri with Mother for over six months before the CINC filing. Mother's desire to move back to Texas does not alter that. Missouri remains A.W.'s home state.

Because Missouri is A.W.'s home state, Missouri has jurisdiction over A.W. unless other possible methods for Kansas to obtain jurisdiction listed in K.S.A. 2020 Supp. 23-37,208(a) apply. One of those is Missouri declining jurisdiction. The State argues Missouri declined jurisdiction; to support its argument, it points to the Missouri social worker stating Missouri was not opening a case and presenting a letter to Mother informing her of that.

Although our research did not reveal a Kansas case addressing whether a letter from a state agency is sufficient to satisfy the requirement under the UCCJEA that the home state decline jurisdiction, the West Virginia Supreme Court has addressed this issue. In *In re J.C.*, 242 W.Va. 165, 832 S.E.2d 91 (2019), law enforcement found J.C. and his mother walking around the streets of a West Virginia town while hitchhiking from Virginia to North Carolina. The mother and J.C. had lived in Virginia for J.C.'s whole life, but the mother was seeking to move to North Carolina. The West Virginia authorities took J.C. into custody and contacted Virginia child protective services. Virginia child protective services told the West Virginia authorities that any family incident occurring in West Virginia had to be handled in West Virginia by West Virginian authorities. West Virginia argued Virginia declined jurisdiction through its child protective services agency. The West Virginia Supreme Court disagreed, holding

that the UCCJEA expressly required a court of Virginia to decline jurisdiction, not some state agency. The West Virginia Supreme Court determined that "for a circuit court to obtain subject matter jurisdiction of a child whose home state is not West Virginia, . . . a 'court' of the home state of the child must decline to exercise jurisdiction." 242 W.Va. at 173; see also *In re Joseph B.*, No. D065833, 2014 WL 5409006, at *6 (Cal. Ct. App. 2014) (unpublished opinion) (court's contact with law clerk at court in Nevada insufficient to establish that state's declination of jurisdiction).

Although not binding, we find the reasoning of the West Virginia Supreme Court to be persuasive. The State argues the district court had jurisdiction under K.S.A. 2020 Supp. 23-37,201(a)(3) because Missouri declined jurisdiction. K.S.A. 2020 Supp. 23-37,201(a)(3) gives a Kansas court subject matter jurisdiction when "all courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum." The plain language of the statute requires a court, not a state agency, of another state to decline jurisdiction. Here, no Missouri court has declined jurisdiction.

### B.     *Unjustifiable conduct*

The State also argues the district court could exercise jurisdiction under K.S.A. 2020 Supp. 23-37,208. According to the State, under this provision of the UCCJEA, Mother's act of taking A.W. to Kansas for medical treatment to avoid Missouri social services was unjustifiable conduct and amounted to an acquiescence to Kansas' jurisdiction.

K.S.A. 2020 Supp. 23-37,208(a)(1)-(2) states that if a Kansas court has jurisdiction under the UCCJEA "because a person seeking to invoke its jurisdiction has engaged in unjustifiable conduct, the court shall decline to exercise its jurisdiction

13

unless" the parents of the child have acquiesced to the jurisdiction or a court of a state otherwise having jurisdiction determines Kansas is a more appropriate forum.

The State claims Mother engaged in unjustifiable conduct when she brought A.W. to Kansas for medical treatment because the last time A.W. was in a Missouri hospital for diabetic ketoacidosis, the hospital called child services. The State also asserts Mother acquiesced to Kansas' jurisdiction by taking A.W. to Kansas for medical treatment and not objecting to the district court's exercise of jurisdiction when the case was filed.

We are unpersuaded by the State's argument for two reasons. First, it ignores the statute's plain language. K.S.A. 2020 Supp. 23-37,208(a) directs a district court to decline jurisdiction when "a person *seeking* to invoke its jurisdiction has engaged in unjustifiable conduct." (Emphasis added.) See UCCJEA § 208, comment ("This section applies to those situations where jurisdiction exists because of the unjustified conduct of the person seeking to invoke it."). While Mother may have been attempting to avoid Missouri DFS, there is no evidence she wanted the State of Kansas involved in her children's care. In fact, Mother refused assistance absent a court order. Moreover, it is the State which invoked Kansas' jurisdiction when it filed the CINC petition. Under the statute's plain language, it is the State that must have engaged in unjustifiable conduct. See UCCJEA § 208, comment ("The focus in this section is on the unjustified conduct of the person who invokes the jurisdiction of the court."). Unsurprisingly, the State makes no such claim. Thus, because Mother has never sought a Kansas court's jurisdiction in this matter, whether she engaged in unjustifiable conduct is irrelevant to the issue of subject matter jurisdiction.

Second, the State claims Mother acquiesced to Kansas jurisdiction because she brought A.W. to Kansas and did not object to the district court exercising jurisdiction after the CINC petition was filed. But Mother did not bring A.W. to Kansas to invoke Kansas' jurisdiction. Moreover, the State's argument ignores the well-established rule that

14

subject matter jurisdiction cannot be waived and may be challenged at any time. *In re K.L.B.*, 56 Kan. App. 2d at 437. While voluntarily bringing a child to a health care facility in Kansas may constitute sufficient grounds for personal jurisdiction, in Kansas, it does not satisfy the UCCJEA's requirements for subject matter jurisdiction. See K.S.A. 2020 Supp. 23-37,201(c) (physical presence or personal jurisdiction over party or child insufficient for subject matter jurisdiction); see generally K.S.A. 2020 Supp. 60-308(b)(1) (listing acts in Kansas that constitute submission to state's jurisdiction).

      C.     *Emergency jurisdiction*

The State also asserts the district court had emergency jurisdiction over A.W. because his hospitalization for his diabetes presented an emergency and because Mother "effectively abandoned" A.W. at a Kansas hospital.

"Emergency jurisdiction under the UCCJEA allows courts to enter *temporary* orders to protect a child—but absent child abandonment, the situation must indeed be an *emergency*." *In re A.A.*, 51 Kan. App. 2d at 806. "An emergency is '[a] serious situation or occurrence that happens unexpectedly and demands immediate action.' American Heritage Dictionary 583 (5th ed. 2011)." 51 Kan. App. 2d at 807. But the fact that a child may be a CINC is an insufficient basis for emergency jurisdiction. 51 Kan. App. 2d at 807. K.S.A. 2020 Supp. 23-37,204(a) provides:

> "A court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse."

If a previous child custody determination or proceeding exists, any emergency order must specify the period the court considers adequate to allow the person seeking an

order to obtain such order from a court of a state having jurisdiction. K.S.A. 2020 Supp. 23-37,204(c); see *In re A.A.*, 51 Kan. App. 2d at 808 ("Kansas court must 'immediately communicate' with the other court and must 'set a specific duration of any temporary orders.'"). If no child custody proceeding has been commenced in a court of a state having jurisdiction, an emergency child custody order remains in effect until an order is obtained from a court of a state having jurisdiction. If a proceeding is not commenced, then an order entered under this statute becomes final. K.S.A. 2020 Supp. 23-37,204(b).

At the initial April 17, 2020 hearing in which the district court issued a temporary custody order, the record shows the district court perfunctorily asserted on the record that it had subject matter jurisdiction. No one raised the issue of subject matter jurisdiction, and it was not discussed. In its written journal entry and order of temporary custody, most of which appears to be boilerplate, the district court stated:

> "[A]n emergency exists which threatens the safety of the child as follows:  Serious medical neglect regarding the child's diabetic condition. The child has been hospitalized numerous times and . . . the extreme mismanagement could be fatal or have significant physical consequences[.] Mother has been uncooperative with social services and father is deceased."

After the district court issued its initial temporary custody order, at no time was the issue of jurisdiction raised in any subsequent hearing. Moreover, the district court did not limit the timeframe of its CINC adjudication to give the appropriate Missouri court the opportunity to issue an order.

The State's argument focuses on whether an emergency truly existed, as if that fully empowered the district court to act as it did. We agree that the evidence in the record—showing A.W. had been hospitalized five times for diabetic ketoacidosis in a little over two years and Mother's difficulty obtaining insulin during that time—supports the district court's assumption of emergency jurisdiction to act to ensure the safety of

A.W. But even if an emergency as defined by the UCCJEA existed, the district court was limited by the statute to only exercising temporary emergency jurisdiction and issuing temporary orders to protect the child until the state with home state jurisdiction could act. See *In re E.D.*, 812 N.W.2d 712, 717 (Iowa App. 2012) (emergency jurisdiction confers upon court power to enter temporary protective orders); UCCJEA § 204, comment (purpose of emergency jurisdiction is to protect child and allow for temporary protective orders until state with jurisdiction issues appropriate orders). Such authority does not extend to issuing more permanent orders such as a CINC adjudication. See 812 N.W.2d at 718 (no authority to issue CINC adjudication under emergency jurisdiction); *In re A.L.H.*, 160 Vt. 410, 414, 630 A.2d 1288 (1993) (emergency jurisdiction confers only power to issue temporary protective orders, not permanent custody orders). Thus, while the district court had the authority under its emergency jurisdiction to issue temporary protective orders, in the absence of a court in Missouri waiving jurisdiction, it lacked the authority to issue its CINC adjudication.

Complicating our analysis here is the fact that no jurisdictional dispute yet exists because, according to the record before us, no child custody proceedings have been initiated in a court in Missouri. As we have explained, our emergency jurisdiction statute indicates that any temporary emergency orders issued become final in the absence of any orders from a home state court. See K.S.A. 2020 Supp. 23-37,204(b). This suggests that temporary emergency jurisdiction can ripen into home state jurisdiction once the home state declines jurisdiction. See *In re E.T.*, 2015 WL 1125364, at *7; see also *In re Gino C.*, 224 Cal. App. 4th 959, 967, 169 Cal. Rptr. 3d 193 (2014) (emergency jurisdiction may only ripen if home state declines jurisdiction). But no Missouri court has ever declined jurisdiction, and the district court adjudicated A.W. as a CINC on August 17, 2020, less than six months after A.W.'s presence in Kansas began. Thus, the district court's emergency jurisdiction had not yet ripened into home state jurisdiction.

Therefore, we vacate the district court's adjudication of A.W. as a CINC and remand the matter to the district court. On remand, we order the district court to contact the appropriate Missouri court to ascertain if that court is willing to exercise jurisdiction. If the Missouri court is willing to take jurisdiction, then A.W.'s case should be transferred to Missouri. See *In re J.C.*, 242 W.Va. at 175. If the Missouri court declines jurisdiction, then the district court should go through the appropriate steps to determine if it has subject matter jurisdiction over A.W. under the UCCJEA. See *In re A.A.*, 51 Kan. App. 2d at 812; *In re E.T.*, 2015 WL 1125364, at *7-8 (district court's jurisdiction ripened into home state jurisdiction once Missouri court declined jurisdiction).

Vacated and remanded with directions.